UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| *In re:* | ) | CASE NO. 13-74158-bem |
| HUDGINS HOLDINGS, LLC., | ) | CHAPTER 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR
CHAPTER 11 PLAN OF REORGANIZATION OF
HUDGINS HOLDINGS, LLC,
DATED MAY 20, 2014**

JIMMY L. PAUL
*Georgia Bar No. 567600*

CHAMBERLAIN, HRDLICKA, WHITE
WILLIAMS & AUGHTRY
191 Peachtree Street, N.E., 34th Floor
Atlanta, Georgia  30303
(404) 659-1410
(404) 659-1852 (facsimile)
jimmy.paul@chamberlainlaw.com

*Counsel for Debtor Hudgins Holdings, LLC*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................- 1 -

    A.      Purpose of Disclosure Statement ..................................- 1 -

    B.      Sources of Information Stated in Disclosure Statement ..................- 3 -

    C.      Disclaimer Respecting Court's Approval of Disclosure
    Statement ........................................................- 3 -

II.     EVENTS LEADING TO COMMENCEMENT OF DEBTOR'S
CHAPTER 11 CASE ............................................................- 3 -

III.    DESCRIPTION OF DEBTOR'S PROPERTY, DEBTOR'S
PRINCIPALS, BUSINESS OPERATIONS AND OTHER
SIGNIFICANT RELATIONSHIPS ...........................................- 6 -

    A.      Background of Debtor's Management and Operations ....................- 6 -

    B.      Pre-Petition Operations ..........................................- 6 -

    C.      Post-Petition Operations..........................................- 6 -

        1.      Sale of the 125 Westridge Office Building...........................- 7 -

        2.      Operation of the 223 McDonough Parkway
        Office/Warehouse Building ....................................- 7 -

        3.      Operation of the 363 McDonough Parkway
        Office/Warehouse Building ....................................- 8 -

        4.      Crisp County Farm.............................................- 8 -

        5.      Blalock/Goldmine Road Residential Investment Property....- 8 -

        6.      Negotiations of a Consensual Plan ..............................- 9 -

    D.      Debtor's Assets and Debt, and Source of Valuation of Assets ........- 9 -

        1.      223 McDonough Parkway Office/Warehouse Building........- 9 -

        2.      363 McDonough Parkway Office/Warehouse Building........- 9 -

        3.      130 Acre Crisp County Farm ...................................- 10 -

        4.      Blalock/Goldmine Road Residential Investment Property..- 10 -

    E.      Estimated Administrative Expenses...............................- 11 -

        1.      Attorneys ....................................................- 11 -

Case 13-74158-bem    Doc 60    Filed 05/20/14    Entered 05/20/14 21:56:25    Desc Main
Document      Page 3 of 75

2.      Appraisers ........................................................- 12 -

IV.    DESCRIPTION OF CLAIMS .................................................- 13 -

A.    Class 1 Administrative Claims ................................- 13 -

B.    Class 2 Non-Tax Priority Claims ...................................- 14 -

C.    Class 3 Priority Tax Claims ........................................- 14 -

D.    Class 4   Peoples Bank Secured Claim 223 McDonough Parkway Office/Warehouse...............................- 14 -

E.    Class 5   Peoples Bank Secured Claims - 363 McDonough Parkway Office/Warehouse..............................- 15 -

F.    Class 6  SRF/RoundPoint Secured Claim .......................- 15 -

G.    Class 7 South Georgia Bank Secured Claim.................- 16 -

H.    Class 8 Henry County Secured Tax Claim ...................- 16 -

I.    Class 9 Unsecured, Non-Priority, Non-Insider, Non-Deficiency Claims...............................................- 16 -

J.    Class 10 Unsecured, Non-Priority, Non-Insider Deficiency Claims................................................- 17 -

K.    Class 11 Unsecured Non-Priority, Insider Claims ........................- 17 -

L.    Class 12 Equity Interest Claims ...............................- 17 -

V.    SUMMARY OF PLAN .................................................- 18 -

A.    Treatment of Creditors in Unimpaired Classes 1, 2 and 3 of Creditors ...................................................- 18 -

1.    Class 1 Administrative Claims .............................- 18 -

2.    Class 2 Non- Priority Tax Claims.........................- 18 -

3.    Class 3 Priority Tax Claims ...............................- 18 -

B.    Treatment of Impaired Classes of Claims 4, 5, 6, 7, 8, 9, 10 and 11 or Class 12 Interests ...............................- 19 -

1.    Class 4 Claims: Peoples Bank Secured Claim - 223 McDonough Parkway Office/Warehouse Claim ................- 20 -

2.    Class 5 Claims: Peoples Bank Secured Claim - 363 McDonough Parkway Office Warehouse Claim .................- 21 -

3. Class 6 RoundPoint Secured Claim ..................................... - 23 -

    (a) Retention of SFR/RoundPoint Lien .............................. - 23 -
    (b) Determination of Allowed Claim................................. - 24 -
    (c) Payment of Interest on Allowed Claim........................ - 24 -
    (d) Lease of Debtor's Blalock/Goldmine Road Property.... - 24 -
    (e) Auction of Debtor's Blalock/Goldmine Road
       Property ...................................................................... - 27 -

4. Class 7 South Georgia Bank Secured Claim ...................... - 29 -

    (a) Extensionof Maturity Date and Amortization
       Schedule of Existing Note Held by South Georgia
       Banking Company.......................................................... - 29 -
    (b) Retention of Security................................................... - 30 -
    (c) Assumption of Crisp County Farm Lease..................... - 30 -
    (d) Application of Lease Payments.................................... - 31 -

5. Class 8 Henry County Secured Tax Claim ......................... - 31 -

    (a) Payment Terms............................................................ - 31 -
    (b) Additional Plan Provisions Related to Payment of *Ad
       Valorem* Taxes ............................................................. - 32 -

6. Class 9 Unsecured, Non-Priority, Non-Insider, Non-
   Deficiency Claims................................................................ - 33 -

    (a) Class 9 Claimants Subject to Convenience Payment
       One Hundred Cents (100¢) on the Dollar Uo to $500 ..- 33 -
    (b) Class 9 Claimants Not Subject to Electing to Be
       Subject to the Convenience Payment............................ - 34 -

7. Class 10 Unsecured, Non-Priority, Non-Insider
   Deficiency Claims................................................................ - 34 -

8. Class 11 Claims: Unsecured, Non-Priority, Insider
   Claims ................................................................................. - 35 -

9. Class 12 Claims: Equity Interest Claims ........................... - 35 -

C. Executory Contracts ................................................................. - 36 -

D. Discharge; Vesting; Injunction.................................................. - 37 -

E. Modification of Plan................................................................. - 38 -

F.    Manner and Means of Execution of Plan ........................................- 38 -

G.    Retention of Jurisdiction ...................................................- 40 -

VI.    FEASIBILITY OF THE PLAN ...............................................- 41 -

VII.    BEST INTERESTS OF CREDITORS TEST ...........................- 47 -

VIII.    RELATIONS WITH AFFILIATES ........................................- 53 -

IX.    FUTURE MANAGEMENT ....................................................- 54 -

X.    IDENTITY AND COMPENSATION OF INSIDERS...........................- 54 -

XI.    DISCUSSION OF CERTAIN TAX CONSEQUENCES ........................- 56 -

A.    In General ...................................................................- 56 -

B.    Tax Consequences to Debtor........................................- 56 -

C.    Class 12 Equity Interests ..............................................- 57 -

D.    Unimpaired Claims, Classes 1 Through 3......................- 57 -

E.    Classes 4, 5, 6 and 7 Secured Claims............................- 57 -

F.    Class 8 Henry County Secured Tax Claim ...................- 59 -

G.    Class 9 Unsecured, Non-Priority, Non-Insider Claims..................- 59 -

H.    Class 10 Unsecured, Non-Priority, Non-Insider Deficiency Claims...........................................................................- 60 -

I.    Class 11 Unsecured, Non-Priority Insider Claims ........................- 61 -

J.    Disclaimers and Notice to Obtain Professional Tax Assistance ....- 61 -

XII.    RISK FACTORS ..................................................................- 63 -

XIII.    DISCLAIMERS ....................................................................- 65 -

XIV.    VOTING, ACCEPTANCE AND CONFIRMATION ..........................- 67 -

-iv-

**SECTION I**
**<u>INTRODUCTION</u>**

**A.**     **<u>Purpose of Disclosure Statement</u>.**

On November 4, 2013, Debtor Hudgins Holdings, LLC ("Debtor Hudgins Holdings") filed for relief under Chapter 11, Title 11, United States Code, in United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.

Debtor files its Disclosure Statement pursuant to the requirements of Section 1125 of the Bankruptcy Code. Debtor's purpose in providing this Disclosure Statement is to provide the Holders of Claims with adequate information about Debtor's Plan to enable creditors to make an informed judgment as to the merits of the Plan. Terms which are defined in Article II of the Plan and capitalized herein, have the meaning defined in Article II of the Plan.

If this Disclosure Statement is determined to be adequate, the Court will set a time and date for the hearing on the confirmation of the Plan. As allowed by the Code, this Disclosure Statement may be amended. When the Plan is distributed, creditors whose Claims have been filed and allowed will have an opportunity to vote on the Plan by completing and mailing ballots which they will receive from the Clerk of Bankruptcy Court. In order to be counted, ballots must be filed within the time ordered by the Bankruptcy Court, or in the absence of such an Order, by

- 1 -

the date of the hearing on confirmation.  The votes of all creditors are important. The Plan can be confirmed by the Bankruptcy Court if it is accepted by Holders of more than two-thirds (⅔) in the amount and more than one-half (½) in number of Claims of the creditors in each class voting on the Plan.  If the requisite acceptances are not obtained as to any specific class, the Bankruptcy Court may confirm the Plan if it finds that the Plan provides fair and equitable treatment to any class which has not accepted the Plan in the requisite number and amount.

**DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATION CONCERNING DEBTOR, PARTICULARLY AS TO THE VALUE OF DEBTOR'S PROPERTY OR PROJECTIONS OF INCOME AND EXPENSES, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE ACCEPTANCES, WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON AS BEING THOSE OF DEBTOR.   ANY SUCH ADDITIONAL REPRESENTATION OR INDUCEMENT SHOULD BE REPORTED TO THE BANKRUPTCY COURT DIRECTLY THROUGH COUNSEL FOR DEBTOR, JIMMY L. PAUL, CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, 191 PEACHTREE STREET, N.E., THIRTY-**

- 2 -

FOURTH FLOOR, ATLANTA, GEORGIA 30303, (404) 659-1410.

**B.** **Sources of Information Stated in Disclosure Statement.**

The information stated in this Disclosure Statement was provided to Debtor's counsel primarily by Debtor Hudgins Holdings, including Morris B. Sprayberry, Jr.

**C.** **Disclaimer Respecting Court's Approval of Disclosure Statement.**

Debtor will seek the Bankruptcy Court's approval of this Disclosure Statement. **SUCH APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR THE PLAN**.

**SECTION II**
**EVENTS LEADING TO COMMENCEMENT OF**
**DEBTOR'S CHAPTER 11 CASE**

Debtor Hudgins Holdings was formed August 7, 2000 as a holding company for the purposes of acquisition, development, and management of investment properties, including commercial property and farm land. At the time of filing this Chapter 11 Case, on November 4, 2013, Debtor had five principal assets: (i) an approximately 27,000 square foot office building located at Westridge Industrial

Parkway, McDonough, Henry County, Georgia (125 Westridge Office Building");

(ii) two office/warehouse buildings on McDonough Parkway, Henry County,

Georgia; (iii) approximately 130.37 acres of farmland located in Crisp County,

Georgia; and (iv) and a five bedroom residential property located on Blalock

Goldmine Road, on Lake Burton, Clayton, Rabun County, Georgia which property

is held for investment ("Blalock/Goldmine Road Residential Property").  On the

Petition Date, Debtor's 125 Westridge Office Building, its two office/warehouse

buildings and its farm property were all being managed by Debtor, and rented to

approximately 11 third party tenants.  Debtor's Blalock/Goldmine Road Residential

Property on Lake Burton was being held for sale.

Prior to 2013, Debtor's 27,000 square foot 125 Westridge Office Building

had maintained an approximately 59.33% occupancy rate.  One of Debtor's

principal tenants was Georgia State University which rented a large portion of

Debtor's 125 Westridge Office Building for classroom and teaching purposes.  In

approximately August, 2013, Georgia State University terminated its lease.

Shortly thereafter, two other tenants terminated their leases.  As a result of these

terminations Debtor's annual gross rents from approximately $289,198.08 per year

to approximately $85,630.08 per year; termination of the Georgia State Lease

reduced occupancy at the 125 Westridge Office Building from approximately

59.33% to approximately 31.66%.  As a result of this decrease in occupancy, Debtor's 125 Westridge Office Building did not generate funds sufficient to pay all operating expenses and monthly escrows for *ad valorem* taxes.  In addition, after termination of the Georgia State lease, the 125 Westridge Office Building did not generate rent sufficient to pay any debt service, which was approximately $142,800 per year.  Although no default had been declared by the secured creditor holding the first priority lien on the 125 Westridge Office Building, and no foreclosure was pending, Debtor filed its Chapter 11 on November 4, 2013, in part to have time and the ability to reorganize the approximately $3,500,000 secured debt, either through replacing the lost rents over a period of time, or through a sale of the property for amounts sufficient to pay the debt and possibly recover some of Debtor's equity.

In addition, the first in priority secured debt on Debtor's five bedroom Blalock/Goldmine Road Residential Investment Property on Lake Burton matured and the secured creditor holding the lien on that property began foreclosure proceedings.  Debtor's Chapter 11 was also filed in part to allow Debtor to preserve its equity in this residential investment property.

- 5 -

**SECTION III**
**DESCRIPTION OF DEBTOR'S PROPERTY,**
**DEBTOR'S PRINCIPALS, BUSINESS OPERATIONS**
**AND OTHER SIGNIFICANT RELATIONSHIPS**

**A.**    **Background of Debtor's Management and Operations.**

Debtor Hudgins Holdings is a Georgia limited liability company formed on August 7, 2000.    Its principal office is located at 125 Westridge Industrial Boulevard, McDonugh, Henry County, Georgia.  Morris B. Sprayberry, Jr. holds a 5% ownership interest in Debtor Hudgins Holdings, and serves as the managing member of Debtor.  The other owner members of Debtor Hudgins Holdings are: Jo A. Hudgins (20%); S. Melissa Hudgins (12.5%); Erin E. Hudgins (12.5%); Anna K. Hudgins (12.5%); McKenzie K. Hudgins (12.5%); Andrew C. Hudgins (12.5%) and Gerald B. Hudgins (12.5%).  The day to day operations of Debtor Hudgins Holdings are managed and conducted by managing member Morris B. Sprayberry, Jr.

**B.**    **Pre-Petition Operations.**

Pre-petition, Debtor Hudgins Holdings held various types of commercial investment properties.  However, the recession which began in 2008 ultimately caused the liquidation of many of these properties.

**C.**    **Post-Petition Operations.**

Debtor Hudgins Holdings commenced this case by a voluntary Chapter 11

- 6 -

filing on the Petition Date, November 4, 2013. A brief summary of post-petition operations is as follows:

1.     **Sale of the 125 Westridge Office Building**.   As set forth above, the loss of Georgia State University and two additional tenants at the 125 Westridge Office Building, and the lack of expectation for replacing the tenant for this space during 2014, or perhaps longer, led to Debtor's decision to sell the 125 Westridge Office Building.   This sale was approved by Order of the Bankruptcy Court entered April 18, 2014. [ECF No. 54.]   The sale results in satisfaction of secured debt in the amount of approximately $3,500,000, and accrued *ad valorem* taxes of approximately $65,000.   As a result of this sale, Debtor's aggregate secured debt is reduced from approximately $7,718,425 to approximately $4,217,425.

2.     **Operation of the 223 McDonough Parkway Office/Warehouse Building**.     Debtor has continued to operate the 223 McDonough Parkway Office/Warehouse Building this is a 30,000 square foot office/warehouse building, it is 100% occupied.   During the post-petition period, Debtor has paid monthly operating expenses, escrowed *ad valorem* taxes monthly and accumulated a portion of $50,087.27 in a cash collateral account which is consolidated with cash collateral related to Debtor's 363 McDonough Parkway 17,000 square foot office/warehouse building because the buildings have the same secured creditor,

and the secured creditor wanted cash collateral from both buildings consolidated.

3. **Operation of the 363 McDonough Parkway Office/Warehouse Building.** Debtor has continued to operate the 363 McDonough Parkway Office/Warehouse Building this is a 17,000 square foot office/warehouse building, it is 69% occupied. During the post-petition period, Debtor has paid monthly operating expenses, escrowed *ad valorem* taxes monthly and accumulated a portion of $50,087.27 in a cash collateral account which is consolidated with cash collateral related to Debtor's 223 McDonough Parkway 30,000 square foot office/warehouse building because the buildings have the same secured creditor, and the secured creditor wanted cash collateral from both buildings consolidated.

4. **Crisp County Farm.** Debtor's 100 acre Crisp County Farm is leased for $50,000 per year through September 2020. Annual lease payments are received by Debtor in June of each year. Debtor expects to receive the annual $50,000 lease payment in June 2014. This payment will enable Debtor to pay the approximately $31,156.22 debt service payment due South Georgia Bank and accrued *ad valorem* taxes.

5. **Blalock/Goldmine Road Residential Investment Property.** Debtor has continued to maintain the Blalock/Goldmine Road residential property and continue in its efforts to market this property.

- 8 -

6.  **Negotiations of Consensual Plan.**  Debtor has been able to negotiate what it anticipates will be a consensual plan with nearly all Classes of Secured Creditors.

D.  **Debtor's Assets and Debt, and Source of Valuation of Assets.**

Debtor's primary assets are:

1.  **223 McDonough Parkway Office/Warehouse Building.**  Debtor's 223 McDonough Parkway Office/Warehouse Building is a 30,000 square foot office warehouse. The property is located at 223 McDonough Parkway, McDonough, Georgia.   The secured indebtedness pertaining to this property is $843,104.31, which is evidenced by two Notes with outstanding balances of $637,262.68 and $205,841.63.  Debtor estimates the value of this property at this time under present occupancy to be approximately $750,000 to $900,000. The source of this valuation is Debtor's management.  Debtor does not have any current appraisal pertaining to this property.

2.  **363 McDonough Parkway Office/Warehouse Building.**  Debtor's 363 McDonough Parkway Office/Warehouse Building is a 17,000 square foot office warehouse. The property is located at 363 McDonough Parkway, McDonough, Georgia.   The secured indebtedness pertaining to this property is $466,469.10, which is evidenced by two Notes with outstanding balances of

$258,203.28 and $208,264.85. Debtor estimates the value of this property at this present time under present occupancy to be approximately $510,000. The source of this valuation is Debtor's management. Debtor does not have any current appraisal pertaining to this property.

3.    **130 Acre Crisp County Farm.**   Debtor's 130 acre farm in Crisp County, Georgia is currently the subject of a lease/purchase agreement.   The lease/purchase agreement requires the lessee to pay Debtor $50,000 per year as a lease payment, which payments are credited to the purchase price.   The lease became effective in August 2011 and expires September 1, 2020.  Lease payments are made annually on the 15th day of June.  The farm is subject to a secured debt held by South Georgia Banking Corp. in the amount of $200,786.63.  The annual payments on this debt are $31,156.22.  Debtor's estimate of the value of this property is approximately $300,000.  While there is equity in the property, the farm remains subject to the lease/purchase agreement.  Debtor's equity is being realized through the payments on the lease/purchase agreement. The source of Debtor's estimate of value is Debtor's management.

4.    **Blalock/Goldmine Road Residential Investment Property.** Debtor owns a 5 bedroom residential investment property located on the shore of Lake Burton, in Rabun County, Georgia.  The indebtedness claimed by the secured

creditor is $2,242,385.42 in principal, plus alleged interest and late charges. Debtor's estimate of the value of this property is in the range of $3,000,000 to $3,300,000, assuming a reasonable marketing period of between one and two years.  The source of this valuation is Debtor's management.

E.    **Estimated Administrative Expenses.**

Administrative Claim is defined in the Plan as a claim for payment of an administrative expense of a kind specified in Section 503(b) of the Code and entitled to priority pursuant to Section 507(a)(2) of the Code, to the extent not previously paid.  Administrative Claims include but are not limited to Claims for: the actual, necessary costs and expenses incurred after the Petition Date of preserving Debtor's Estate and operating its business, including, without limitation, wages, salaries, commissions, professional fee Claims, and fees and charges assessed against Debtor's Estates under 28 U.S.C. § 1930.

1.    **Attorneys.**  Debtor has employed Jimmy L. Paul and the firm of Chamberlain, Hrdlicka, White, Williams & Aughtry, and attorneys associated with that firm.  Debtor's attorneys will be paid pursuant to orders of the Bankruptcy Court approving applications for payment under applicable law.  As discussed in the "Disclosure Statement" filed in connection with Debtor's Application to Hire Counsel, filed November 18, 2013, 2013 [ECF. No. 17], and granted by Order

- 11 -

entered December 18, 2013 [ECF. No. 31], a prepetition retainer of $50,000.00 had been paid and has not yet been applied.  For the period from November 4, 2013 through May 2, 2014, Debtor's counsel has expended time before applying any discounts, which, if approved at the hourly rates set forth in its application for employment, would result in compensation in the amount of $52,802.75 in fees. Debtor's counsel has also made disbursements on behalf of Debtor for necessary expenses through May 2, 2014, which if approved by the Court would result in reimbursements in the amount of approximately $2,624.29.   The amount of additional fees from May 20, 2014 through the Confirmation Date will depend in part on actions taken by creditors.  In the event 2010-3 SFR Ventures LLC or its servicing    agent    RoundPoint    Mortgaging    Servicing    Corporation ("SFR/RoundPoint") or other parties initiates litigation pertaining to objections to Disclosure Statement, valuation, feasibility, and other Confirmation issues, as well as other matters, the attorney's fees may increase by $50,000 to $75,000.  If this litigation is not required, attorney's fees may increase by $25,000.

　　　　2.    **Appraisers**.   At this time, Debtor does not anticipate seeking orders authorizing employment of appraisers.  If it becomes necessary to hire appraisers, administrative expenses will increase.

## SECTION IV
## DESCRIPTION OF CLAIMS

As set forth in Debtor's Plan, Debtor has 12 Classes of Claims and Interests. Those Classes include 5 Classes of Secured Claims.  Classes of Claims and Interests are more specifically identified and described in Section III of the Plan. The estimated total dollar amounts of Claims in the specific Classes of debt are briefly described below:

**A.**     **Class 1  Administrative Claims.**

Administrative Claims are defined in Section II of the Plan.  As set forth above, Administrative Claims related to professional services are estimated to be in the range of $20,000 to $50,000 pertaining to attorney's fees in excess of the $50,000 retainer held by attorneys.  The range of fees in excess of the $50,000 retainer being held by Debtor's counsel depends on actions taken in response to actions by SFR/RoundPoint responding to treatment under the Class 6 Claim and action of certain other creditors.

In addition, Debtor estimates Administrative Claims pertaining to *ad valorem* tax escrows for post-petition *ad valorem* taxes for Henry County, Crisp County and Rabun County real property for tax year 2014 are in the amount of $46,352.07.  Henry County taxes which constitute $28,804.05 of this amount are being escrowed monthly.

- 13 -

Debtor will continue to incur United States Trustee's fees paid on a quarterly basis during the pendency of this case and prior to Confirmation. In addition, $10,400 are being withheld from proceeds from sale of Debtor's 125 Westridge Office Building to pay estimated Trustee fees related to the sale of that office building.

**B.      Class 2 Non-Tax Priority Claims.**

Non-Tax Priority Claims, defined in Section II of the Plan, are classified as Class 2 Claims pursuant to Section III of the Plan. No claims with Class 2 were scheduled, and Debtor does not know of any Class 2 non Tax Priority Claims.

**C.      Class 3 Priority Tax Claims.**

Priority Tax Claims defined in Section II of the Plan, are classified as Class 3 Claims pursuant to Section III of the Plan. Priority Tax Claims relate to *ad valorem* taxes on Debtor's Property for tax year 2013, which are in the amount of $31,542.80 excluding: (i) any Priority Tax Claims pertaining to the 125 Westridge Office Building which Priority Tax Claims will be paid on the sale of that buildings.

**D.      Class 4 Peoples Bank Secured Claims - 223 McDonough Parkway Office/Warehouse.**

The Class 4 Peoples Bank Secured Claim, defined in Section II of the Plan, consists of the Allowed Claims of Peoples Bank scheduled by the Debtor. These

- 14 -

Claims are evidenced by two notes secured by one Security Deed.  The Notes have outstanding balances of $637,262.68 and $205,841.63 and are secured by Debtor's 223 McDonough Parkway Office/Warehouse Building totaling approximately $843,104.31.

**E.     Class 5 Peoples Bank Secured Claims - 363 McDonough Parkway/Office Warehouse.**

The Class 5 Peoples Bank Secured Claim, defined in Section II of the Plan, consists of the Allowed Claims of Peoples Bank scheduled by the Debtor. These Claims are evidenced by two notes secured by one Security Deed.  The Notes have outstanding balances of $258,203.28 and $208,264.85 and are secured by Debtor's 223 McDonough Parkway Office/Warehouse Building totaling approximately $466,469.10.

**F.     Class 6 SRF/RoundPoint Secured Claim.**

The Class 6 Allowed Claim, defined in Section II of the Plan, consists of the secured claim of 2010-3 SFR Venture Capital, LLC and apparently administered by service agent RoundPoint Mortgage Corporation which claim is scheduled by the Debtor as disputed in the amount of $2,242,385.42 and secured by Debtor's Balock/Goldmine Road Residential Investment Property.

Document      Page 21 of 75

G.     **Class 7 South Georgia Bank Secured Claim.**

The Class 7 Allowed Claim, defined in Section II of the Plan, consists of the secured claim held by South Georgia Banking Corp. scheduled by the Debtor in the amount of $200,786.63 and secured by Debtor's 130 Acre Crisp County Farm.

H.     **Class 8 Henry County Secured Tax Claim.**

The Class 8 Tax Claim, defined in Section II of the Plan, consists of a Secured Tax Claim held by Henry County Tax Commissioner in the approximate amount of $104,630.36 for tax years 2011 and 2012, as alleged to be due pre-petition by the Henry County Tax Commissioner as set forth in the Henry County Tax Commissioner Proof of Claim No. 1, after reduction of post-petition payments of the Secured Tax Claim of $21,046.00 pertaining to Debtor's 125 Westridge Commercial Office Building which taxes are being paid as a result of the sale of that office pursuant to this Court's Order entered April 18, 2014. [ECF No. 54.]

I.     **Class 9 Unsecured, Non-Priority, Non-Insider, Non-Deficiency Claims.**

The Class 9 Claims consist of Allowed Claims which are unsecured, not entitled to priority, not Claims held by Insiders as defined by 11 U.S.C. § 101(31) and not Deficiency Claims remaining after foreclosure securing the indebtedness from which the Deficiency Claims arose.  Debtor estimates these claims are in between the approximate amount of $25,000 to $30,000.

**J.**   **Class 10 Unsecured Non-Priority, Non-Insider Deficiency Claims.**

The Class 10 Claims, defined in Section II of the Plan, consist of Allowed

Claims which are unsecured, not entitled to priority, not Claims held by Insiders,

and are deficiency claims resulting from amounts remaining due after pre-petition

foreclosures.   The Claims are held by Hamilton State Bank resulting from

deficiencies resulting from pre-petition foreclosures on real estate collateral

regarding which Debtor is alleged to have liability as guarantor of the secured

indebtedness. The Claims are in the approximate amount of $464,425.43 and

$447,879.64 totaling in the aggregate amount of $912,305.07.

**K.**   **Class 11 Unsecured Non-Priority, Insider Claims.**

The Class 11 Allowed Claims, defined in Section II of the Plan, consist of

unsecured claims respecting any pre-petition loans or advances to Debtor by

Insiders as defined by 11 U.S.C. § 101(31).   Debtor estimates these Class 11

Claims are in the approximate amount of approximately $4,536,000.

**L.**   **Class 12 Equity Interest Claims.**

The Class 12 Equity Interest Claims, defined in Section II of the Plan, are

the membership interests in Debtor which interests are held by:   Morris B.

Sprayberry, Jr. (5%); Jo A. Hudgins (20%); S. Melissa Hudgins (12.5%); Erin E.

- 17 -

Hudgins (12.5%); Anna K. Hudgins (12.5%); McKenzie K. Hudgins (12.5%); Andrew C. Hudgins (12.5%) and Gerald B. Hudgins (12.5%).

**SECTION V**
**SUMMARY OF PLAN**

**A.**    **Treatment of Creditors in Unimpaired Classes 1, 2 and 3 of Creditors.**

**1.**    **Class 1 Administrative Claims**.  Class 1 Administrative Claims will be paid in full on the latter of: (i) the Consummation Date; or (ii) the date on which such person becomes a holder of an Allowed Administrative Claim, unless the holder of the Allowed Administrative Claim provides a written waiver of the requirement of payment on the Consummation Date.

**2.**    **Class 2 Non- Priority Tax Claims.**  Debtor did not schedule any Class 2 Non-Priority Tax Claims and has no knowledge of any such claims.

**3.**    **Class 3 Priority Tax Claims**.  The *ad valorem* tax claims on Debtor's Property due for the tax year 2013, totaling approximately $31,542.80, after reduction of $64,743.94 of *ad valorem* taxes which were paid as a result of sale of the 125 Westridge Office Building approved by Court Order entered April 18, 2014. [ECF No. 54.]  These Claims constitute Priority Tax Claims.  Debtor's Plan provides that Class 3 Priority Tax Claims will be paid in equal, consecutive, quarterly installments, with interest, during a period which commences on the first day of the calendar quarter which is the latter of: (i) the first calendar quarter which

commences not less than 70 days from the Consummation Date; or (ii) the first calendar quarter which commences not less than 70 days from the Distribution Date, and which payment period terminates not later than November 3, 2018, which is within 5 years from the Petition Date.  Debtor's Plan further provides that Debtor will pay interest on the Class 3 Priority Tax Claim as necessary to ensure that the holder of the allowed Class 3 Priority Tax Claim receives the full value of its Allowed Priority Tax Claim necessary to justify a deferred payment of the Allowed Priority Tax Claim, in order to comply with Section 1129(a)(9)(C) of the Code.

**B.**     **Treatment of Impaired Classes of Claims 4, 5, 6, 7, 8, 9, 10 and 11 or Class 12 Interests.**

Classes of Claims 4, 5, 6, 7, 8, 9, 10 and 11 are impaired.  The treatment of these Classes of Claims is detailed as set forth in Article V of Debtor's Plan.  The treatment of these Claims is briefly described below; however, creditors and other parties in interest are directed to the provisions of Debtor's Plan for specific details for treatment under the Plan.

- 19 -

1.   **Class 4 Peoples Bank Secured Claim - 223 McDonough Parkway**

**Office/Warehouse Claims**.  Debtor's Plan provides that the Class 4 Peoples Bank

Secured Claim - 223 McDonough Parkway Office/Warehouse Claim will be

treated as follows:

People's Bank shall retain its first in priority lien on Debtor's 223

McDonough Parkway Office/Warehouse Building.  Cash collateral resulting from

the 223 McDonough Parkway Office/Warehouse Building, after payment of

necessary operating expenses and escrows for *ad valorem* taxes ("Net Cash

Collateral") will be paid to Peoples Bank as agreed by Debtor and Peoples Bank or

ordered by the Court.  The Cash Collateral will be applied to Note No. 31472 held

by Peoples Bank, which Note had an outstanding balance of $637,262.68 on the

Petition Date.  Net Cash Collateral generated by the 233 McDonough Parkway

Office/Warehouse Building was approximately $33,580.70 as of April 1, 2014.

Any Net Cash Collateral not paid to Peoples Bank prior to the Consummation Date

will be paid on the Confirmation Date.  The Net Cash Collateral paid to Peoples

Bank shall be applied to monthly payments due on Note 31472 in the amount of

$4,384.11 per month commencing November 20, 2013 and continuing through the

Consummation Date.  These payments will be credited in the manner and amount

the payments would have been credited had payments been made on the monthly

- 20 -

due dates, *i.e.*, first to interest on the contract non-default rate, and next to principal.

The maturity date of Note 31472 will be extended to November 8, 2018. Monthly payments shall continue to be made in equal installments in the amount of $4,384.11 per month.

Peoples Bank also holds a separate Note Number 31473 which had an outstanding principal balance of $205,841.63, on the Petition Date. This Note is also secured by the same Security Deed which secures Peoples Bank No. 31472. The Maturity Date on this Note will likewise be extended to November 8, 2018. All other terms of Peoples Bank Note 31473 will remain the same such that interest accrues on the outstanding principal balance. All principal and accrued interest will come due on November 8, 2018.

**2.** **Class 5 Peoples Bank Secured Claim - 363 McDonough Parkway Office/Warehouse Claims**. Debtor's Plan provides that the Class 5 Peoples Bank Secured Claim - 363 McDonough Parkway Office/Warehouse Claim will be treated as follows:

People's Bank shall retain its first in priority lien on Debtor's 363 McDonough Parkway Office/Warehouse Building. Cash collateral resulting from the 363 McDonough Parkway Office/Warehouse Building, after payment of

necessary operating expenses and escrows for *ad valorem* taxes ("Net Cash Collateral") will be paid to Peoples Bank as agreed by Debtor and Peoples Bank or ordered by the Court. The Cash Collateral will be applied to Note No. 31474 held by Peoples Bank, which Note had an outstanding balance of $258,203.28 on the Petition Date. Net Cash Collateral generated by the 363 McDonough Parkway Office/Warehouse Building was approximately $10,231.87 as of April 1, 2014. Any Net Cash Collateral not paid to Peoples Bank prior to the Consummation Date will be paid on the Confirmation Date. The Net Cash Collateral paid to Peoples Bank shall be applied to monthly payments due on Note 31474 in the amount of $1,771.10 per month commencing November 20, 2013 and continuing through the Consummation Date. These payments will be credited in the manner and amount the payments would have been credited had payments been made on the monthly due dates, *i.e.*, first to interest on the contract non-default rate, and next to principal.

The maturity date of Note 31474 will be extended to November 8, 2018. Monthly payments shall continue to be made in equal installments in the amount of $1,771.10 per month.

Peoples Bank also holds a separate Note Number 31475 which had an outstanding principal balance of $208,264.85, on the Petition Date. This Note is

- 22 -

also secured by the same Security Deed which secures Peoples Bank No. 31474.

The Maturity Date on this Note will likewise be extended to November 8, 2018.

All other terms of Peoples Bank Note 31475 will remain the same such that

interest accrues on the outstanding principal balance.  All principal and accrued

interest will come due on November 8, 2018.

3.     **Class 6 SRF/RoundPoint Secured Claim**.     The Class 6

SRF/RoundPoint Secured Claim is a disputed claim which has an outstanding

principal balance in the approximate amount of $2,242,355.42.  Thus far, Debtor

has been unable to make contact with a representative with RoundPoint, the

servicer for creditor, and the attorney for SRF/RoundPoint states she has no

authority to negotiate.  Debtor's Plan provides that in the event that Debtor is not

able to reach agreement regarding the treatment of the Class 6 SFR/RoundPoint

Secured Claim, the Claim shall be satisfied by a specific request of Debtor for

treatment pursuant to 11 U.S.C. § 1129(b).  Unless some other request for

treatment is made prior to conclusion of the Confirmation Hearing, the Plan

provides that request for treatment will be as follows:

(a)     Retention of SFR/RoundPoint Lien. .   The Holder of the Class

6 SFR/RoundPoint Secured Claim, if Allowed, will retain its lien on all of the

- 23 -

collateral it held on the Petition Date, pending payment in the manner set forth herein.

(b)  <u>Determination of Allowed Claim</u>.   On or before the Confirmation Date the amount of the Allowed Secured Claim held by SFR/RoundPoint will be determined by agreement or by order of this Court, including any valuation required under Section 506 of the Code.

(c)  <u>Payment of Interest on Allowed Claims</u>.  Commencing on the first month anniversary of the Confirmation Date and continuing for 24 consecutive months, Debtor shall pay interest on the SFR/RoundPoint Allowed Claim (including any Post-Petition interest allowed by Court Order) at the rate of 4% *per annum* or at the "Determined Fair Interest Rate" in the event the holder of the SFR/RoundPoint Secured Claim contests the proposed 4% *per annum* interest rate.

(d)  <u>Lease of Debtor's Blalock/Goldmine Road Property</u>.   Debtor will enter into a Lease, Right of First Refusal and Option Agreement ("Lease/Option Agreement") with Peachtree Securities Company ("Lessor") respecting Debtor's Blalock/Goldmine Road Property pursuant to the terms of a Lease/Option Agreement to be filed on or before a hearing on Debtor's Disclosure

- 24 -

Statement pertaining to this Plan which Lease/Option Agreement will include terms as follows:

(i)      *Lease Term*:    24 months, subject to termination as described below.

(ii)      *Lease Payments*: The Lease/Option Agreement will provide for payment on the first day of each month, commencing on the first month anniversary of the Confirmation Date and continuing for 24 consecutive months, of an amount which equals the sum of 4% *per annum* of the outstanding principal balance of the SFR/RoundPoint Allowed Claim plus the amount necessary to make *pro rata* monthly escrows for escrow of *ad valorem* taxes and insurance coming due during each calendar year ending or beginning during the Lease/Option Agreement term.    Provided however, in the event the Court determines that interest must be paid on the SFR/RoundPoint Claim at a Determined Fair Interest Rate which exceeds 4% *per annum*, the Lease/Option Agreement payment will be increased from 4% to the amount which equals the Determined Fair Interest Rate.

(iii)      *Right of First Refusal*:   During the first seventeen (17) months of the Lease/Option Agreement, the lessee shall have rights as follows:  If Debtor obtains a *bona fide* offer to sell the Blalock/Goldmine Road Property at a

- 25 -

price sufficient or more than sufficient to obtain a release of the Deed to Secure

Debt and other security documents securing the SFR/RoundPoint Allowed Claim,

and Debtor decides to accept the offer, Debtor shall first present to lessee a true

and correct copy of a contract executed by the proposed Purchaser ("Proposed Sale

Contract").  Lessee shall have 15 business days from receipt of the copy of the

Proposed Sale Contract within which to give notice of lessee's agreement to

purchase the Blalock/Goldmine Road Property on the same terms set out in the

Proposed Sale Contract ("Lessee's Purchase Notice") except that lessee shall not be

required to close in less time than 30 days after lessee's timely delivery of Lessee's

Purchase Notice; rather, lessee shall have the longer of 30 days from delivery of

the Lessee's Purchase Notice or the closing date specified in the Proposed Sale

Contract within which to close the sale.  Delivery of Lessee's Purchase Notice shall

result in a binding purchase contract between lessee and Debtor on the same terms

as set out in the Proposed Sale Contract, except for the provision set out

immediately above respecting the Closing Date.  If Debtor  gives notice of a

Proposed Sale Contract and closes the purchase of the Blalock/Goldmine Road

Property, whether to the proposed purchaser named in the Proposed Sale Contract

or pursuant to lessee's right of first refusal, the Lease/Option Agreement terminates

as of the Closing Date.  If Debtor does not close a sale of the Blalock/Goldmine

Road Property as a result of the Proposed Sale Contract, the Lease/Option Agreement shall continue in effect until the earlier of any closing of sale pursuant to the terms of any other Proposed Sale Contract, or the specified termination date of the Lease/Option Agreement.

(iv)   *Option to Purchase*:   Commencing with the first day of the 18th month from the effective date of the Lease and continuing for the remaining term of the Lease, the Lessee shall have the option during the remaining term of the Lease to purchase the Blalock/Goldmine Road Property for the amount of the SFR/RoundPoint Allowed Claim minus any reductions as a result of post-confirmation payments and plus any additions as a result of non-payment of interest at the post-confirmation rate agreed by the parties or the Determined Fair Interest Rate in the absence of agreement by the parties.

(e)   <u>Auction of Debtor's Blalock/Goldmine Road Property</u>.

If The SFR/RoundPoint Allowed Secured Claim is not paid by the 24th Month after Consummation Date, the Blalock/Goldmine Road Property shall be sold at auction pursuant to the procedure below.

(i)   *Auction Free and Clear of Liens*.   In the event the SFR/RoundPoint Allowed Secured Claim has not been fully paid by the end of 24 months from the Consummation Date, Debtor shall retain a reputable auctioneer

familiar and experienced in auctioning property similar to Blalock/Goldmine Road Property, which auctioneer will commit to advertise and publicize the auction of Debtor's Blalock/Goldmine Road Property in a commercially reasonable way to generate interest in sale of the Property.  The public notice and advertisement of auction shall proceed for not less than 60 days preceding the auction of Debtor's Property.  Debtor will furnish SFR/RoundPoint notice of the proposed auctioneer.  In the event SFR/RoundPoint does not approve the proposed auctioneer, Debtor and SFR/RoundPoint shall be entitled to submit proposed auctioneers to the Court whereupon the Court shall appoint an auctioneer after notice to both Debtor and SFR/RoundPoint, and hearing.   Debtor shall furnish the holder of the SFR/RoundPoint Allowed Claim, copies of all advertisements and notices disseminated by the auctioneer.  The auction of Debtor's Blalock/Goldmine Road Property shall occur before the end of 27 months from the Consummation Date.  The closing of the sale of Debtor's Property shall occur within 30 days from conclusion of the auction.  The auction of Debtor's Property shall be advertised as an auction free and clear of liens, and the title delivered to the purchaser at auction shall be free and clear of liens.

(ii)    *SFR/RoundPoint's Right to Credit Bid*.  SFR/RoundPoint shall have Credit Bid rights as provided in Sections 363(k) and 1129 (b)(2)(A)(ii) of the Code.

(iii)    *Application of Net Sales Proceeds from third party purchase*.  In the event of a sale of Debtor's Blalock/Goldmine Road Property to a Person other than the holder of the Class 6 SFR/RoundPoint Allowed Claim, all Net Sales Proceeds resulting from the sale of Debtor's Property shall be paid to the holder of the Class 6 SFR/RoundPoint Allowed Claim, up to the full amount of the SFR/RoundPoint Allowed Claim, said payments being applied first to the outstanding principal balance of the SFR/RoundPoint Allowed Claim, after which said payment shall be applied to any interest which has accrued and remains unpaid on the principal balance of the SFR/RoundPoint Allowed Claim.

**4.    Class 7 South Georgia Bank Secured Claim**.  The Class 7 South Georgia Bank Secured Claim is impaired.  Debtor's Plan provides the Class 7 Claim will be treated as follows:

(a)    Extension of Maturity Date and Amortization Schedule of Existing Note Held by South Georgia Banking Company.  South Georgia Banking Company presently holds a Promissory Note dated June 10, 2012 in the original principal amount of $220,746.24 providing for annual payments of principal and

- 29 -

interest in the amount of $31,156.22 with interest accruing at 1.75% *per annum* above an index identified as "Wall Street Journal Prime Rate", which Note has a maturity date of June 10, 2015.  The Note is secured by Debtor's 130-acre Crisp County farm which Debtor acquired by Warranty Deed which included an assumption of the indebtedness due South Georgia Banking Company under the above referenced Note and its predecessor Notes ("Crisp County Farm Note"). The indebtedness evidenced by the Crisp County Farm Note will be extended such that the Maturity Date of the indebtedness will be extended to June 10, 2020. Interest will continue to accrue at the rate specified in the Crisp County Farm Note, *i.e.,* 1.75% *per annum* above the Index Rate stated in the Note.  Annual payments of principal and interest will continue to be made on June 10 of each year in the amount of $31,156.22 until the earlier of payment of the Crisp County Farm Note or June 10, 2020.

   (b) <u>Retention of Security</u>.  South Georgia Banking Company shall continue to retain its existing security including the 130-acre Crisp County Farm.

   (c) <u>Assumption of Crisp County Farm Lease</u>. Debtor's Plan provides that Debtor will assume that lease between Hudgins Holdings, LLC and Council & Sons Farms, LLC, dated August, 2011 providing for minimum lease payments in the amount of $50,000 per year payable on June 15 of each year

during the remaining Lease term, *i.e.,* June 15, 2014 through June 15, 2020 ("Crisp County Farm Lease").

(d)    <u>Application of Lease Payments.</u>Debtor's Plan provides Debtor will continue to apply $31,156.22 of the annual Crisp County Farm Lease payments to the payment of debt constituting the Class 7 South Georgia Banking Company Secured Claim, and, in addition, will pay from such lease payments, *ad valorem* taxes assessed against the 130-acre Crisp County Farm, subject to any reimbursement rights from lessee to lessor as set forth in the Crisp County Farm Lease.

5.    **Class 8 Henry County Secured Tax Claim**.   The Class 8 Henry County Secured Tax Claim is impaired.   Debtor's Plan provides this claim will be treated as follows:

(a)    <u>Payment Terms</u>.    Except as provided in subpart B below respecting some provisions pertaining to payment of *ad valorem* taxes, Allowed Claims of Holder of all Class 8 Henry County Secured Tax Claims shall be treated as follows:  The holder of the Class 8 Claim shall retain its tax lien, subject to the provisions set forth below.  The total amount of the Allowed Claim of each holder of a Class 8 Secured Tax Claim, plus any additional payment ordered by the Court as provided herein, shall be paid in equal, consecutive, quarterly installments, over

- 31 -

a period which commences on the first day of the calendar quarter which is the latter of: (i) the first calendar quarter which commences not less than 70 days from the Consummation Date, or (ii) the first calendar quarter which commences not less than 70 days from the Distribution Date, and which period of payment terminates not later than 5 years after the date of the entry of the Order for Relief under Section 301 of the Code, *i.e*., November 3, 2018.  In addition to payments in the amount of the Henry County Allowed Tax Claim, the holder of such Allowed Tax Claim shall be paid Interest in the amount agreed by the parties, or at the Determined Fair Interest Rate computed daily on the unpaid balance of the amount of the Allowed Secured Tax Claim outstanding, in the event the parties are not able to agree on an interest rate.  Payments of interest shall be made simultaneously with quarterly payments on the Allowed Secured Tax Claim.

(b)   Additional Plan Provisions Related to Payment of *Ad Valorem* Taxes.

(i)   Pro rata applications of tax payments among tax parcels. Debtor's Plan provides that so long as more than one tax parcel is subject to pre-petition Henry County Allowed Claims, payments on the Henry County Allowed Claims shall be credited *pro rata* to the amount of tax outstanding on each of the tax parcels included in the Henry County Allowed Claim held by such claimant.

- 32 -

(ii)    Prepayment on sale of an entire tax parcel   In those instances in which Debtor sells property which constitutes an entire tax parcel constituting part, but not all, of the Henry County Allowed Claim the Debtor shall pay at the time of sale the dollar amount of taxes remaining unpaid as related to said tax parcel, after the *pro rata* crediting of tax payments received by the holder of the Henry County Allowed Claim pursuant to subsection A above.

6.    **Class 9 Unsecured, Non-Priority, Non-Insider, Non-Deficiency Claims**.  Debtor's Plan provides that the Allowed Class 9 Unsecured, Non-Priority, Non-Insider, Non-Deficiency Claims will be treated as follows:

(a)    Class 9 Claimants Subject to Convenience Payment – One Hundred Cents (100¢) on the Dollar Up to $500.00.    All Creditors holding allowed Class 9 Unsecured Claims in an amount less than $500.00 will be paid 100¢ on the dollar of their Allowed Claim, which payment will be made within 30 days from the Consummation Date.  Any Person or entity holding an Allowed Class 9 Unsecured Claim in excess of $500.00, which claimant desires to accept $500.00 in satisfaction of its Allowed Claim, will likewise be paid $500.00 in satisfaction of that claimants' Claim within 30 days from the Consummation Date. In the event a claimant holding a Class 9 Unsecured Claim in excess of $500.00 desires to accept $500.00 in satisfaction of its Claim, the claimant must

- 33 -

affirmatively elect treatment under Section 5.7(A) of Debtor's Plan on the claimant's ballot.

(b)      Class 9 Claimants Not Subject to or Electing to Be Subject to the Convenience Payment.  All holders of Allowed Class 9 Claims not subject to or electing to be subject to treatment under Section 5.7(A) of Debtor's Plan shall receive payment in an amount which is the *Pro-Rata* equivalent of the amounts received by holders of Class 10 Unsecured, Non-Priority, Non-Insider, Deficiency Claims.

7.      **Class 10, Unsecured, Non-Priority, Non-Insider Deficiency Claims.**   Debtor's Plan provides that Class 10 Unsecured, Non-Priority, Non-Insider Deficiency Claims shall be satisfied as follows: Debtor is negotiating with the Class 10 Claimant in an effort to reach an agreement regarding an amount to be paid in order to obtain the Class 10 Claimant's consent to Debtor's Plan which provides that the existing equity holders will retain their interest.

In the event Debtor and the holders of the Class 10 Claims cannot reach agreement on a treatment of that Claim, Debtor will amend its Plan and provide for extinction of existing equity interest and issuance of new equity interest in exchange for a contribution which will result in a Plan which can be confirmed as fair and equitable under 11 U.S.C. § 1129(b)(2)(B)(ii) of the Code.

8.    **Class 11 Unsecured, Non-Priority, Insider Claims**.  Debtor's Plan provides that the Class 11 Unsecured, Non-Priority, Insider Claims shall be subordinated to the payment of all Allowed Claims in Debtor's Chapter 11 Case pursuant to the payment provisions of this Plan.  Upon payment of all Allowed Claims in Debtor's Chapter 11 case pursuant to the provisions of Debtor's Plan, the holders of the Class 11 Unsecured, Non-Priority, Insider Claims shall be paid an amount on their Allowed Claims which equal the percentage of payment received by the holders of the Class 10 Unsecured, Non-Priority, Non-Insider Deficiency Claims.

9.    **Class 12 Equity Interest Claims**.    Debtor's Plan provides that the Class 12 Equity Interest Claims shall be treated as follows:

In the event Settlement can be reached with the holders of the Class 10 Claims, the holders of equity interest will retain their interest in the Debtor.  If settlement cannot be reached with the holder of the Class 10 Claims, the existing equity Interests will be terminated and new equity interest will be issued to a third-party in exchange for a capital contribution which will make possible a payment to the holder of the Class 10 Claims in a manner sufficient to satisfy the requirements for fair and equitable treatment under 11 U.S.C. § 1129(b)(2)(B)(ii) of the Code.

C.    **Executory Contracts**.

Article VI of Debtor's Plan provides that Debtor will assume Executory Contracts expressly identified on Exhibit "B" attached to Debtor's Plan. Debtor's Plan provides that the list of Executory Contracts can be amended prior to the Confirmation Date by filing a "Notice of Assumption of Executory Contracts". At this time, Debtor contemplates assuming all existing Executory Contracts, including the existing lease agreement whereby Debtor has leased its 130 acre Crisp County Farm and all of the lease agreements with tenants in Debtor's 223 McDonough Parkway Office/Warehouse Building and Debtor's 363 McDonough Parkway Office/Warehouse Building.

Debtor's Plan provides that any Executory Contract not listed on Exhibit "B" to Debtor's Plan and not listed in any "Notice of Assumption of Executory Contracts" to be filed by Debtor prior to the Confirmation Date, shall be deemed automatically rejected. Provided however, the rejection shall become effective only if Debtor's Plan as modified and amended prior to the Confirmation Date is confirmed. Debtor's Plan provides that any damages that are established against Debtor as a result of any rejection of Executory Contracts shall be treated as a Class 9 Unsecured, Non-Priority, Non-Insider, Non-Deficiency Claim. However, as set forth above, Debtor does not contemplate rejection of any executor contracts.

**D.**    **Discharge; Vesting; Injunction**.

Article VII of Debtor's Plan provides that, except as otherwise provided in the Plan or in an Order Confirming the Plan, Confirmation of Debtor's Plan will discharge Debtor of any "debt" (as that term is defined in Section 101(12) of the Code), whether reduced to judgment or not, liquidated or unliquidated, contingent or non-contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement, obligation, act, event or happening in which any of the Debtor participated, prior to the Confirmation Date.

Debtor's Plan provides that effective on the Confirmation Date, all real estate, improvements, and personal property of Debtor, as Debtor-in-Possession, including but not limited to the real estate constituting the two McDonough Parkway office/warehouse buildings, the 130.37 acre Crisp County Farm and the Blalock/Goldmine Road Residential Investment Property shall vest in Debtor, free and clear of all liens, claims, encumbrances, penalties, assessments, and other interests, except as may otherwise be specifically set forth in this Plan.

Debtor's Plan provides that the Order confirming the Plan, or a separate order of the Court, will include provisions permanently enjoining all persons holding any Claims on or after the Confirmation Date, from taking any action to

- 37 -

enforce rights, or alleged rights, against the Debtor or against any assets of the Debtor, or any collateral in which said claimants assert rights, which rights, or alleged rights, are inconsistent with the rights of secured or unsecured creditors of the Debtor, or other claimants as set out in the Plan, as amended and modified prior to the Confirmation Date, and confirmed by this Court.

**E.**    **Modification of Plan.**

Article VIII of Debtor's Plan provides that Debtor reserves the right to amend or modify its Plan at any time prior to the Confirmation of the Plan.  The Plan also provides that after Confirmation, Debtor reserves the right to modify the Plan as allowed by Section 1127(b) of the Code and applicable law.

**F.**    **Manner and Means of Execution of Plan**.

Article IX of Debtor's Plan provides the following regarding the manner and means by which Debtor's Plan will be executed:

(1)    Debtor shall remain in control of its assets during the entire administration of this Plan.

(2)    Debtor will perform its obligations as Lessor under those leases assumed and listed on Exhibit "B" attached to the Plan, as amended by any Notice of Assumption of Executory contracts, which assumed contracts shall include, but are not limited to, that document

- 38 -

denominated "Lease Purchase Agreement" dated August 2011, executed by Debtor and Council & Sons Farms, LLC pertaining to Debtor's 130-acre Crisp County Farm, and those tenant leases in effect on Debtor's properties, on the Confirmation Date.

(3)    Morris B. Sprayberry, Jr. shall continue as the manager of Debtor, and shall continue in control of the Debtor.

(4)    Debtor, as directed by its managing member, Morris B. Sprayberry, Jr., or such other managing member as elected by the Debtor in substitution of Morris B. Sprayberry, Jr., shall retain full authority to object to Claims, amend and modify this Plan, and administer the assets of the Debtor in conjunction with consummation and execution of this Plan.

(5)    Debtor, acting through Morris B. Sprayberry, Jr. the managing member of Debtor, or such other manager elected by Debtor, shall commence any litigation necessary to realize on Claims constituting assets of the Estate.

(6)    Debtor will operate Debtor's Properties as commercial warehouse space and leased farmland for the purpose of generating sums to contribute to payments required by Debtor's Plan.

(7)    During the 24 month period of interest payments to the holder of the SFR/RoundPoint Class 6 Claim, Debtor will pursue refinancing of the SFR/RoundPoint Allowed Secured Claim and will pursue sale of the Blalock/Goldmine Road Property in order to pay the SFR/RoundPoint Allowed Secured Claim in full.

(8)    Debtor will obtain a loan or capital infusion sufficient to pay Allowed Unsecured Claims in Classes 9 and 10, which loan or capital infusion shall be obtained on or before the Confirmation Date.

## G.    **Retention of Jurisdiction**.

Article X of Debtor's Plan provides that the Court will retain jurisdiction for certain specified purposes including:

(1)    to enforce all causes of action which exist of behalf of the Debtor or any other entity pursuant to the provisions of the Plan;

(2)    to enter orders and injunctions and restraints to enforce the provisions of the Plan;

(3)    to determine claims asserted under Section 507(a)(2) of the Code, including claims for compensation and reimbursement of expenses;

(4)    to determine any disputed claims;

(5)    to enter orders regarding interpretation of the Plan, or any document created in connection with the Plan;

(6)    to conduct hearings and to enter orders modifying the Plan pursuant to Article VIII of the Plan and the Code;

(7)    to determine any and all applications, claims, adversary proceedings, contested or litigated matters pending on the Confirmation Date;

(8)    to determine any applications for rejection or assumption of executory contracts or leases, and to determine claims resulting from rejection of executory contracts and leases; and

(9)    to allow, disallow and estimate, liquidate or determine any claims against the Debtor, including tax claims, and to enter and enforce any order requiring the filing of such claim before a particular date.

## SECTION VI
## FEASIBILITY OF THE PLAN

Feasibility of Debtor's Plan is best analyzed in reference to specific debts and assets rather than general projections of revenue and expenses, because each of Debtor's four remaining assets are discrete in terms of operations.

**1.    Class 1 Administrative Claims.** Class 1 Administrative Claims will be made by funds obtained by the equity interests and deposited prior to the Confirmation Hearing unless the holders of Administrative Claims agree to waive

this requirement of payment at Confirmation. Thus there is no feasibility issue respecting these Claims.

      **2.**      **Class 3 Non-Tax Priority Claims.** Class 3 Non-Tax Priority Claims total $31,540.80. These Claims will be paid quarterly, with interest at 5% per annum, in the amount of approximately $2,187.39, *i.e*. $8,749.56 per year, over a period estimated to commence on October 1, 2014 and ending on October 1, 2018. The source of the payments will be: (i) approximately $16,000.00 per year remaining as proceeds from the annual $50,000.00 Lease Payments on the 130 Acre Crisp County Farm (after payment of debt service and ad valorem taxes pertaining to that property); (ii) funds made available from rental of space at the 223 McDonough Parkway Building during Post-Confirmation year 1, which funds are estimated to be $17,231.00 (after payment of operating expenses, debt service, and current ad valorem taxes) and are estimated to be $28,030.00 during the remaining three Post-Confirmation years over which period tax payments will be made; (iii) $1,882.80 remaining from operation of the 363 McDonough Parkway Office/Warehouse Building after payment of operating expenses, debt service, and *ad valorem* tax escrows related to that building during Post-Confirmation year 1, and $12,672.00 for each of Post-Confirmation years 2 through 4 during which

- 42 -

period *ad valorem* taxes will be paid; and (iv) proceeds of sale of the Blalock/Goldmine Road property, in excess of Secured Claims.

     **3.**     <u>**Class 4 People's Bank Secured Claim – 223 McDonough Parkway Office/Warehouse Claim.**</u>  The 223 McDonough Parkway Office/Warehouse Building was 90% occupied on the Petition Date. Exhibit "A-1" is a projection of income, expenses, and net cash flow before debt service based on the 90% occupancy, and the rent rates existing on the Petition Date. Debtor projects that by the beginning of Post-Confirmation year 2, rents will increase from monthly rents of $8,700.00 per month to approximately $9,600.00 per month as shown on Exhibit "A-2". Debt service on the 223 McDonough Parkway Office/Warehouse Building is $4,384.11 per month, *i.e.* $52,609.32 per year. As shown on Exhibit "A-1", after paying operating expenses, tax escrows, and debt service, Debtor will have remaining funds of $17,230.68 in Post-Confirmation year 1. Debtor projects that by the second year of Post-Confirmation operations, net monthly income will have increased to $6,720.00 per month, *i.e.*, $80,640.00 per year as shown on Exhibit "A-2". Thus, commencing with the second year of Post-Confirmation operations, Debtor projects that it will have approximately $28,030.00 per year above operating expenses, tax escrows, and debt service to contribute to Debtor's other Plan obligations.

- 43 -

4.     **Class 5 People's Bank Secured Claim – 363 McDonough Parkway
Office/Warehouse Claim.**   The 363 McDonough Parkway Office/Warehouse
Building was 80% occupied on the Petition Date.   Exhibit "B-1" includes a
projection of income, expenses, and net cash flow before debt service based on the
80% occupancy and the rent rates existing on the Petition Date.  Debt service on
the 363 McDonough Parkway Office/Warehouse Building is $1,771.10 per month,
*i.e.*, $21,253.20 per year.   As shown on Exhibit "B-1", after paying operating
expenses, tax escrows, and debt service, Debtor will have remaining funds of
$1,882.80 in Post-Confirmation year 1.  Debtor projects that by the second year of
Post-Confirmation operations, net monthly income will have increased to
$4,800.00 per month, *i.e.*, $57,600.00 per year as shown on Exhibit "B-2".  Thus,
commencing with the second year of Post-Confirmation operations, Debtor
projects that it will have approximately $13,883.00 per year above operating
expenses, tax escrows, and debt service pertaining to the 363 McDonough Parkway
Office/Warehouse Building, to contribute to Debtor's other Plan obligations.

5.     **Class 6 RoundPoint Secured Claim.**   Until a sale of Debtor's
Blalock/Goldmine Road residential investment property occurs, the expense to
Debtor of paying interest, ad valorem tax escrows, and insurance will be covered
by the lease of Debtor's property to Peachtree Securities Company.  This is a triple

- 44 -

net lease and there will be no net income or net expenses, to the Debtor during the 24 month term of the Lease, Right of First Refusal, Option Agreement.

6. **Class 7 Crisp County 130 Acre Farm Claim.** As explained above, Debtor receives $50,000.00 in June of each year as lease/purchase payments by the lessee/purchaser of the 130 Acre Crisp County Farm. From this $50,000.00, Debtor pays debt service to South Georgia Bank in the amount of $31,156.22 and ad valorem taxes in the amount of $2,739.43 for a total of $33,895.65. After payment of debt service and ad valorem taxes, Debtor is left with approximately $16,105.00 per year to contribute to Debtor's other obligations under the Plan.

7. **Class 8 Henry County Secured Tax Claim.** The Henry County Secured Tax Claim related to Debtor's 223 McDonough Parkway Office/Warehouse Building and its 363 McDonough Parkway Office/Warehouse Building totals $104,630.36. These claims will be paid quarterly, with interest at 5% per annum in the amount of approximately $7,255.77, *i.e.* $29,023.08 per year. These payments are over a period estimated to commence on October 1, 2014 and continue through October 1, 2018, which is within the five year period within which the Secured Tax Claim must be paid. The sources of payment of these quarterly tax payments will be: (i) approximately $16,000.00 available from payments on the 130 Acre Crisp County Farm Lease Purchase Agreement after

- 45 -

payment of underlying debt service and ad valorem taxes related to that property; (ii) approximately $17,230.68 in year 1 and approximately $28,030.68 in years 2 through 4, which sums will be available from the continued operations of Debtor's 223 McDonough Parkway Office/Warehouse Building; (iii) approximately $1,882.00 in year 1 and $13,883.00 in years 2 through 4 resulting from the operation of Debtor's 363 McDonough Parkway Office/Warehouse Building; (iv) proceeds remaining from sale of the Blalock/Goldmine Road Residential Investment Property after payment of secured liens on that property; and (v) and in year 1 a capital contribution of approximately $3,000.00 by the equity owners, to the extent such capital contribution is necessary, to assure payment of the Henry County Secured Tax Claim.

8.    **Class 9 Unsecured, Non-Priority, Non-Insider, Non-Deficiency Claims and Class 10 Unsecured, Non-Priority, Non-Insider, Deficiency Claims.**  Payments of these Unsecured Claims will be made by cash deposits made by equity owners prior to the Confirmation Date.

9.    **Class 11 Unsecured, Non-Priority, Insider Claims.**  These claims will be paid, if at all, after payment of all other claims.  The Insiders agree to this treatment.

- 46 -

## SECTION VII
## <u>BEST INTERESTS OF CREDITORS TEST</u>

Under Section 1129(a)(7) of the Code, the Court must find that either all members of an impaired class of claims or interests have accepted the Plan or that the Plan will provide a creditor who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount such holder would recover if the Debtor were liquidated under Chapter 7 of the Code.  This requirement is called the "Best Interest of Creditors Test".  Debtor Hudgins Holdings anticipates that all impaired creditors will vote in favor of the Plan.

The following Classes are unimpaired within the meaning of Section 1124 of the Code such that the Best Interest of Creditors Test does not apply to these Classes: Class 1 Administrative Claims; Class 2 Non-Tax Priority Claims; and Class 3 Priority Tax Claims.

Regarding the Class 4 Peoples Bank Secured Claim - 223 McDonough Parkway Office/Warehouse Building Claim, Debtor shows that Debtor anticipates the Class 4 Peoples Bank Secured Claim will be accepted by the Claimant, Peoples Bank.  Thus the best interest of creditor's test does not apply to this Class.  In the event the holder of the Class 4 Peoples Bank Secured Claim did not accept the treatment proposed in Debtor's Plan, Debtor's Plan would be amended to provide

- 47 -

treatment under 1129(b)(2)(A)(i) in which case this Disclosure Statement would be amended in order to establish that treatment proposed to the Class 4 Claimant under Section 1129(b)(2)(A)(ii) satisfied the requirements of Section 1129(a)(7) of the Code.

Regarding the Class 5 Peoples Bank Secured Claim - 363 McDonough Parkway Office/Warehouse Building Claim, Debtor shows that Debtor anticipates the Class 5 Peoples Bank Secured Claim will be accepted by the Claimant, Peoples Bank. Thus the best interest of creditor's test does not apply to this Class. In the event the holder of the Class 5 Peoples Bank Secured Claim did not accept the treatment proposed in Debtor's Plan, Debtor's Plan would be amended to provide treatment under 1129(b)(2)(A)(i) in which case this Disclosure Statement would be amended in order to establish that treatment proposed to the Class 5 Claimant under Section 1129(b)(2)(A)(ii) satisfied the requirements of Section 1129(a)(7) of the Code.

Regarding the Class 6 SFR/RoundPoint Secured Claim, Debtor shows the treatment proposed for Class 6 complies with Section 1129(a)(7) because the treatment proposed will allow the holder of the Class 6 Claim to receive or retain under Debtor's Plan, property of a value as of the effective date of the Plan that is not less than the Class 6 creditor would receive in a Chapter 7 liquidation. The

principal indebtedness apparently claimed by the Class 6 SFR/RoundPoint Secured

Claimant is $2,242,385.42.  Debtor values the 5 bedroom residential investment

property which is the security for this claim at $3,000,000 to $3,200,000 assuming

the property is properly exposed to the market for between one and two years.

Under Debtor's Plan, the Class 6 Claimant will retain its lien on Debtor's 5

bedroom residential investment property.  The property would be leased for a 24

month period with monthly lease payments sufficient to pay the Class 6 Claimant

interest at a market rate set by the Court, in the event the Class 6 Claimant rejects

the 4% per annum interest proposed in Debtor's Plan.  In addition, the lease

payments would be sufficient to maintain escrows for *ad valorem* taxes and

insurance.  Debtor's Plan provides that during the first 17 months of the 24 month

lease, Debtor will market the property for the purpose of obtaining a sale sufficient

to pay the Class 6 Claimant in full and recover some of Debtor's costs in the

property.   Debtor's Plan provides that during the last 6 months of the 24 month

lease, the lessee of the Property has an option to acquire Debtor's 5 bedroom

residential property by satisfying the Class 6 Claim.  Debtor's Plan provides that in

the event the property has not been sold, or Debtor's Class 6 Claim has not been

either refinanced with another lender or satisfied, Debtor's 5 bedroom residential

investment property will be auctioned by public auction. The Plan provides that the

Class 6 Claim will have credit bid rights as provided in Sections 363(k) and 1129(b)(2)(A)(ii) of the Code. Under the treatment proposed for Class 6, the Class 6 Claimant will not receive less than it would receive in a Chapter 7 liquidation. Thus, the treatment satisfies the best interest of creditor's test set out in Section 1129(a)(7).

Regarding the Class 7 South Georgia Banking Secured Claim, Debtor anticipates The Class 7 Claimant will accept Debtor's Plan such that compliance with Section 1129(a)(7) of the Code will not be required respecting this Class 7. However, Debtor shows that in any event, Debtor's treatment of the Class 7 Claim provides for payment in full of the Claim, including interest. The payments under the lease/purchase agreement in effect respecting Debtor's 130 acre Crisp County Farm are sufficient to timely pay the annual installments on the Class 7 Claim and are sufficient to support an extension of the maturity date pursuant to the provisions of 1129(b)(2)(A)(i) in the event the Class 7 Claimant did not accept the extension of the maturity date proposed in the treatment of Class 7 Claim.

Regarding the Class 8 Henry County Secured Tax Claim which is in the amount of approximately $104,630.36, for tax years 2011 and 2012, Debtor shows the treatment proposed complies with the best interest of creditors test under Section 1129(a)(7). Debtor's Plan proposes that Henry County will retain its lien

- 50 -

on the Debtor's properties on which the tax claims are based. Debtor's Plan provides that the Class 8 Henry County Secured Tax Claim will be paid 100¢ on the dollar in quarterly installments over a period not longer than 5 years from the Petition Date. In addition, the Class 8 Henry County Secured Tax Claim will be paid interest at 5%, or in the event Henry County Tax Commissioner does not agree to accept 5% interest, interest at the Determined Fair Interest Rate set by this Court, as the amount sufficient to assure that the Henry County Tax Commissioner receives total value, as of the Effective Date of the Plan, equal to the Allowed Amount of its Claim. This treatment proposed for the Class 8 Henry County Secured Tax Claim is not less than the amount the Claimant would receive if Debtor were liquidated under Chapter 7. Thus, this treatment satisfies the best interest of creditors test under Section 1129(a)(7).

Regarding the Class 9 Unsecured, Non-Priority, Non-Insider, Non-Deficiency Claims, and Class 10 Unsecured, Non-Priority, Non-Insider, Deficiency Claims, Debtor's Plan proposes to pay unsecured creditors in Classes 9 and 10 some amount of money. Debtor has no unencumbered assets. Debtor's 223 McDonough Parkway Office/Warehouse Building and its 363 McDonough Parkway Office/Warehouse Building do not generate any cash flow in excess of amounts due secured debt. These properties would not generate any funds above

secured debt in the event of a liquidation by a Chapter 7 trustee. Debtor's 130 Acre Crisp County Farm is subject to a lease/purchase agreement and a Secured Claim. A Chapter 7 liquidation of Debtor's 130 Acre Crisp County Farm would not result in any funds available to unsecured creditors. Debtor's Blalock/Goldmine Road Residential Investment Property would not be expected to generate any funds for unsecured creditors because a Chapter 7 Trustee would not be able to preserve and maintain the property, keep the property insured and pay property taxes during an estimated 1 to 2 year marketing period necessary to achieve an arm's length fair market sale. Rather, an auction by a Chapter 7 Trustee would not be expected to generate sums in excess of the secured creditors' claims, the expenses of an auctioneer and the trustee's fees and expenses related to a sale.

Regarding the Class 11 Unsecured, Non-Priority, Insider Claims, this Class of creditors will accept Debtor's Plan and Section 1129(a)(7) will not apply to Class 11 Claimants.

Regarding the Class 12 Equity Interest Claims, the equity interest holders will accept Debtor's Plan such that the best interest of creditors test set out in Section 1129(a)(7) does not apply to the Class 12 Equity Interest Claimants.

## SECTION VIII
## RELATIONS WITH AFFILIATES

The only affiliate with whom Debtor has a business relationship is Apple Real Estate Services, LLC.  This company is a real estate brokerage firm owned 100% by Jo A. Hudgins. who is a 20% owner of Debtor.  Morris B. Sprayberry, Jr., is a 5% owner of Debtor and the managing member of Debtor, and is the real estate broker of record for Apple Real Estate Services, LLC.  Apple Real Estate Services, LLC has not charged any leasing commissions or other compensation from Debtor during the pendency of this case.  Prior to commencement of this case, Apple Real Estate Services, LLC has been provided office space at the 125 Westridge Industrial Office Building without paying rent because it is the manager of that building and because the building was never more than 50% occupied.   The building is being sold pursuant to this Court's April 18, 2014 Order [ECF No. 54].  Subject to the pleasure of the purchaser of 125 Westridge Industrial Office Building, Apple Real Estate Services, LLC will at least temporarily continue to manage the 125 Westridge Industrial Office Building and act as leasing agent, after title is transferred to the purchaser.

Post-confirmation, Apple Real Estate Services, LLC may seek leasing commissions pertaining to the rental of Debtor's 223 McDonough Parkway Office/Warehouse Building and/or Debtor's 363 McDonough Parkway

- 53 -

Office/Warehouse Building if cash flow permits such commissions and if the secured lender consents.  These circumstances are considered unlikely. In addition, Apple Real Estate Services, LLC may seek a sales commission if it is involved in the sale of Debtor's Blalock/Goldmine Road Residential Investment Property; however, any such commission would only be paid from net proceeds of sale after payment of all secured indebtedness and taxes.

## SECTION IX
## FUTURE MANAGEMENT

Debtor Hudgins Holdings will continue to be managed by its managing member Morris B. Sprayberry, Jr. as set forth in Article IX of  the Plan.

## SECTION X
## IDENTITY AND COMPENSATION OF INSIDERS

Jo A. Hudgins is an insider because she owns 20% membership interest in Debtor and is therefore an affiliate under Section 101(2)(A) of the Code and therefore an insider under Section 101(31)(E) of the Code.  Morris B. Sprayberry, Jr. is an insider because he is the managing member of Debtor and owns a 5% ownership interest in Debtor.  The other members of Debtor Hudgins Holdings each own 12.5% membership interest in Debtor.  These members owing a 12.5% membership interest are: S. Melissa Hudgins (12.5%); Erin E. Hudgins (12.5%); Anna K. Hudgins (12.5%); McKenzie K. Hudgins (12.5%); Andrew C. Hudgins

- 54 -

(12.5%) and Gerald B. Hudgins (12.5%).  In addition, Apple Real Estate Services, LLC is an insider because Jo A. Hudgins owns 20% of Debtor and owns 100% of Apple Real Estate Services, LLC.  None of the members of Debtor, whether insider or not, have received any compensation from Debtor Hudgins Holdings during the pendency of this case.  Nor has Debtor's affiliate, Apple Real Estate Services LLC received any compensation from Debtor during the pendency of this case.  During the post-confirmation period, Debtor does not contemplate that its members will receive any compensation, except that if cash flow permits and the secured lender respecting Debtor's two McDonough Parkway Office/Warehouse Properties consent, Debtor Apple Real Estate Services, LLC may receive leasing commissions relating to Debtor's 223 McDonough Parkway Office/Warehouse Building and/or its 363 McDonough Parkway Office/Warehouse Building. Likewise, in the event the sale of Debtor's Blalock/Goldmine Road Residential Investment Property results in sale proceeds in excess of secured debt, and in the event Apple Real Estate Services, LLC is involved in a sale of that property, Apple Real Estate Services, LLC may receive a commission from any proceeds of sale, which would be paid from funds remaining after payment of secured debt.

- 55 -

# SECTION XI
## DISCUSSION OF CERTAIN TAX CONSEQUENCES

The confirmation and execution of the Plan may have certain tax consequences to holders of Claims and Interests, as well as to Debtor.

## A.   In General.

The federal income tax consequences of the implementation of the Plan to a creditor will depend in part on (a) whether the creditor's Claim constitutes a security for federal income tax purposes; (b) whether the creditor reports income on the accrual basis, (c) whether the creditor receives consideration in more than one tax year, (d) whether all the consideration received by the creditor is deemed to be received by that creditor as part of an integrated transaction.  Debtor does not believe that any of its non-insider, non-priority, unsecured Claims will constitute securities for federal income tax purposes.  Thus Debtor does not believe that any funds received by non-insider, non-priority, unsecured creditors will be deemed to be funds received in exchange for securities, such that same could be taxed as a capital transaction.

## B.   Tax Consequences to Debtor.

Debtor Hudgins Holdings, LLC is a limited liability company.  It is a tax filing entity; however, it is not a tax paying entity.  Rather, it is a pass through entity for purposes of taxation and tax consequences are passed to equity interest.

C.    **Class 12 Equity Interests.**

The Class 12 Equity Interest holders are: Jo A. Hudgins (20%); Morris B. Sprayberry, Jr. (5%); S. Melissa Hudgins (12.5%); Erin E. Hudgins (12.5%); Anna K. Hudgins (12.5%); McKenzie K. Hudgins (12.5%); Andrew C. Hudgins (12.5%) and Gerald B. Hudgins (12.5%).  The holders of the Equity Interests have waived any disclosure regarding tax consequences to themselves as a result of an Order confirming Debtor's Plan.

D.    **Unimpaired Claims, Classes 1 Through 3.**

Classes 1 through 3 are unimpaired and not entitled to vote on Debtor's Plan. Because these Claims are not entitled to vote, disclosures are not required respecting tax consequences to the holders of these Claims.

E.    **Classes  4, 5, 6 and 7 Secured Claims.**

The federal tax consequences to the Class 4, 5, 6 and 7 Secured Claims of an order confirming Debtor's Plan depend on a number of elections and a number of bookings by the holders of these Claims, all of which elections and bookings are beyond the knowledge of Debtor.  For example, a holder of one of these Claims could have classified its Claim as a "non-accruing" loan, meaning that interest will not be booked as earnings, even though payments are received.  Debtor believes that some or all of the Class 4, 5, 6 and 7 Secured Claims could have been

- 57 -

classified as totally or partially non-accruing, for any number of reasons including the mere fact of filing this Chapter 11 proceeding by Debtor.  Because Debtor has no knowledge regarding the manner in which the holder of these Claims classified their Claims or will book the receipt of payment from Debtor, Debtor cannot make meaningful disclosures regarding tax consequences to the holders of these Claims respecting an order confirming Debtor's Plan.

Further, tax treatment of these Claims also related to whether or not a holder of one of these Claims has established reserves respecting its Claim, and if so, in what amounts.  To the extent reserves have been established and losses have been or will be charged against earnings as a result of these reserves for a tax year, subsequent payments which enable the holders of these Claims to eliminate reserves generally constitute income during the year in which the reserves are released.  Because Debtor has no knowledge regarding whether or not any of the Class 4, 5, 6, or 7 Claims have established reserves, and if so, in what amount, Debtor cannot meaningfully address the tax consequences to the holders of these Claims respecting an order confirming Debtor's Plan.

- 58 -

**F.**    **Class 8 Henry County Secured Tax Claim** .

Henry County is a governmental entity and does not pay taxes.  Because Henry County is not a tax paying entity no disclosures are required regarding this Class 8 Secured Tax Claim.

**G.**    **Class 9 Unsecured, Non-Priority, Non-Insider Claims**.

Assuming the holders of the Class 9 Unsecured, Non-Priority, Non-Insider Claims related to goods or services are on a cash basis for tax accounting purposes, any payments received by the holders of these Claims will generally be treated as part of gross receipts and gross taxable income during the tax period in which the payments are received.  The consequences of the receipt of such payments will depend on a multitude of other factors beyond the knowledge of Debtor including the amount of all gross receipts and gross taxable income received during the tax period, and the amount of all deductible expenses available to each creditor during the tax period.

In the event holders of Class 9 Unsecured, Non-Priority, Non-insider Claims pertaining to goods or services are on accrual accounting for tax purposes, the tax consequences to the holders of such Claims depend on a number of factors unknown by Debtor, including:  whether or not each unsecured claim has been written off completely, reserved against, or is being treated as a collectible account.

- 59 -

To the extent any holder of such Claim is using the accrual method for tax accounting purposes, Debtor does not have sufficient information to make meaningful disclosure regarding tax consequences to such creditor of an order confirming Debtor's Plan.

To the extent that holders of Class 9 Unsecured, Non-Priority, Non-Insider Claims hold Claims pertaining to loans to Debtor, any payments under the Plan which are allowed to be allocated to return of principal, should not result in taxable income.  Any payments which are required to be allocated to payment of interest should be expected to be included in gross income.

**H.**    **Class 10 Unsecured, Non-Priority, Non-Insider Deficiency Claims.**

The Class 10 Claims are Deficiency Claims relate to two secured notes respecting pre-petition foreclosures. The holder of the Claims is a loss-share bank. For the reasons set forth in Section E above, which is incorporated by reference herein, Debtor cannot make any meaningful disclosures regarding the tax consequences to the holder of the Class 10 Unsecured, Non-Priority, Non-Insider Deficiency Claims.  In addition, the provisions related to loss-share are partially confidential and Debtor cannot know what portions of the Class 10 Claims have been written off; nor will Debtor know how any recovery on the Class 10 Unsecured, Non-Priority, Non-Insider Deficiency Claims will be apportioned as

- 60 -

between the Claimant Hamilton State Bank and the FDIC.  Thus, for this additional

reason, Debtor cannot make meaningful disclosures regarding the tax

consequences to the holder of these Class 10 Claims respecting an order

confirming Debtor's Plan.

**I.**     **Class 11 Unsecured, Non-Priority Insider Claims.**

The holders of the Class 11 Unsecured, Non-Priority Insider Claims have

waived any disclosure regarding tax consequences to themselves as a result of an

order confirming Debtor's Plan.

**J.**     **Disclaimers and Notice to Obtain Professional Tax Assistance.**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A

SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

OF THE PLAN.  THE FOREGOING DISCUSSION IS NOT A SUBSTITUTE

FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE

ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS

NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES

UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S

INDIVIDUAL CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO:

WHETHER THE HOLDER HAS PREVIOUSLY CLAIMED A BAD DEBT

DEDUCTION WITH RESPECT TO ITS CLAIM AGAINST DEBTOR;

WHETHER THE HOLDER OF A CLAIM REPORTS INCOME ON THE
ACCRUAL OR CASH BASIS; WHETHER THE HOLDER OF A CLAIM
RECEIVES DISTRIBUTIONS UNDER THE PLAN IN MORE THAN ONE
TAXABLE YEAR; WHETHER THE CLAIM CONSTITUTES A CAPITAL
ASSET IN THE HANDS OF THE HOLDER, AND HOW LONG IT HAS BEEN
HELD OR IS TREATED AS HAVING BEEN HELD; AND ACCORDINGLY,
HOLDERS ARE URGED TO CONSULT ITS TAX ADVISORS ABOUT THE
U.S. FEDERAL, STATE AND NON-U.S. INCOME TAX AND OTHER TAX
CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT
CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (i) ANY
DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE
STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON,
AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE
OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER
UNDER THE TAX CODE; (ii) SUCH DISCUSSION IS INCLUDED HEREBY
BY DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING
(WITHIN THE MEANING OF CIRCULAR 230) BY DEBTOR OF THE
TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (iii) EACH

HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**SECTION XII**
**<u>RISK FACTORS</u>**

Debtor's property consists of two office/warehouse buildings located in McDonough, Georgia, a 130 acre farm located in Crisp County, Georgia and a 5 bedroom residential investment property located on Lake Burton in Rabun County, Georgia.

Risk factors related to these assets are different.   Thus risk factors are discussed in reference to the ownership, operation, and sale of the assets.

(1)    **<u>130 Acre Crisp County Farm Property</u>**.   Debtor's 130 acre farm property in Crisp County is the subject of a lease/purchase agreement regarding which the lessee purchaser pays $50,000 on June 15 of each year through June 15, 2020, at which time the purchase is complete. The Debtor is not subject to any risk regarding its lease/sale agreement except for any potential default by the lessee/purchaser.  Debtor's 130 Acre Crisp County Farm Property is being leased and purchased by a company which buys and sells large volumes of riding horses throughout the United States, generally at prices ranging between $2,500 to $6,500 a horse.  The company  and the family business which preceded the company have been in business for many years, and are considered to be established. The primary

risk related to Debtor's receipt of remaining lease/purchase payments would be a general downturn in the economy which affected the demand for riding horses in the $2,500 to $6,000 range.  Debtor's lessee/purchaser could also be adversely affected by other matters such as competition, or general decline in demand for riding horses.

(**2**)    **Blalock/Goldmine Road Residential Investment Property.**    The Blalock/Goldmine Road 5 bedroom residential property is located at Lake Burton in Rabun County, Georgia.  Debtor is holding the property for sale to recover equity above the secured debt.  The residence is located directly on the shore of Lake Burton and is an upscale residence in an area of expensive permanent and second family homes.  Debtor's ability to sell this residential investment property for amounts in excess of the debt could be adversely affected by a decline in the general economy or a decline in the economy in the North Georgia area including Atlanta which decline could adversely affect the demands for upscale second homes or upscale permanent retirement homes.  In addition, Debtor's residential investment property is located approximately 4 miles from a real estate development known as Waterfall which was a high-end development for second family and permanent homes that failed as a result of the recession which began in late 2008. As a result of the failure of the Waterfall development,       there  is  an

- 64 -

inventory of high-end developed lots at the Waterfall development which could be considered competition in that the lots are available as a site for building properties which could be argued to compete with Debtor's residential investment property.

(3) **223 McDonough Parkway Office/Warehouse Building and 363 McDonough Parkway Office/Warehouse Building.** These two office warehouse properties are constructed generally with 3,000 square foot office/warehouse bays. The bays are generally rented to service industries, i.e., gymnasiums, training facilities, and other types of businesses selling services, or to distribution companies. Many of the companies are local companies rather than national tenants. Some of these local companies may be start-up companies and some are established businesses. The service companies and distribution companies are sensitive to local economic conditions and can be adversely affected by downturns in the local economy resulting in vacancies or turnovers in rentals.

### SECTION XIII
### DISCLAIMERS

The statements contained in this Disclosure Statement are made as of the date hereof, and unless another time is specified herein, neither the delivery of this Disclosure Statement nor an exchange of rights made in connection herewith, shall under any circumstance, create an implication that there has been no change in the facts set forth herein since the date hereof.

Any benefits offered to the holders of Claims or Interests, in accordance with the Plan, which may constitute securities, have not been approved or disapproved by the Securities and Exchange Commission (the "Commission"), or by any relevant government authority of any state of the United States. Neither the Commission, nor any such state authority, has passed upon the accuracy of this Disclosure Statement or the merits of the Plan.

No representations concerning Debtor, the value of its assets, or the value of any benefits offered to holders of Claims or Interests in connection with the Plan are authorized by Debtor, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure acceptances which are contrary to the information contained in this Disclosure Statement should not be relied on by any holder of a Claim or Interest in arriving at its decision. Any such additional representations or inducements should be reported to counsel for Debtor, Jimmy L. Paul, Chamberlain, Hrdlicka, White, Williams & Aughtry, 191 Peachtree Street, N.E., 34th Floor, Atlanta, Georgia 30303. The information contained herein has not been subjected to a certified audit. As of this date, the Court has not determined the value of Debtor's Property or Debtor's other assets.

The approval by the Bankruptcy Court of this Disclosure Statement does not constitute an endorsement by the Court of the Plan of Reorganization, or a guarantee of the accuracy or completeness of the information contained herein.

## SECTION XIV
## VOTING, ACCEPTANCE AND CONFIRMATION

Under the Plan, holders of Claims whose Claims are impaired by the Plan are provided the opportunity to vote to accept or to reject the Plan. The Court will determine whether impaired classes of Claims have accepted the Plan by determining whether sufficient acceptances have been received by the holders of Claims in such classes. A class of Claims is impaired if the Claims constituting that class are not paid in full, or if the Claims are adversely affected by the Plan. An impaired class of Claims will be determined to have accepted the Plan if the holders of Allowed Claims in that class casting voting in favor of the Plan:

(i)     hold at least two-thirds (⅔) in dollar amount of the Allowed Claims of the holders in such class who actually vote, and

(ii)    comprise more than one-half (½) the number of holders of the Allowed Claims in such class who actually vote on the Plan.

The vote of the class binds all members of the class. Thus, if a class votes to accept the Plan, the provisions of the Code designed to protect rejecting classes cannot be invoked by members of that class who voted to reject the Plan.

Conversely, if a class rejects the Plan, then members of such class who voted to accept the Plan will be deprived of the benefits of the Plan if it is not confirmed.

The Code does not require that every class of Claims vote in favor of the Plan. The Plan, however, must be accepted by at least one class of holders of Claims deemed impaired under the Plan. The Court may also confirm the Chapter 11 Plan over the objection of one or more classes of Claims. The criteria under which the Court may confirm the Plan over the objection of one or more classes of Claims are set forth in Section 1129(b) of the Code. These criteria include the requirement that the Court find, with respect to each class that does not accept the Plan:

    (i)    that the Plan does not discriminate unfairly against such class;

    (ii)    that the Plan is fair and equitable to such class; and

    (iii)    that the value or benefits to be distributed to the members of such class will not be less than the amount members of that class would receive if Debtor were liquidated under Chapter 7 of the Code.

Even if all classes of Claims accept the Plan, however, the Court may deny confirmation of the Plan, if either the Plan or proponents of the Plan fail to comply with all applicable provisions of the Code. The Court must confirm the Plan only if it determines that the Plan meets all the requirements of Section 1129 of the

Code governing confirmation of a plan of reorganization, which determinations include, but are not limited to:

(i)     that Debtor has complied with the applicable provisions of Chapter 11, including the provision of Sections 1122 and 1123 of the Code governing classification of Claims and contents of a plan of reorganization;

(ii)    that Debtor has proposed the Plan in good faith, and has not proposed anything in the Plan which is forbidden by law;

(iii)   that Debtor has disclosed every payment or promise made by Debtor, to any person or entity for services in connection with the Chapter 11 case;

(iv)    that one or more of the impaired classes of Claims have voted to accept the Plan;

(v)     that the Plan is fair and equitable to any non-accepting impaired class of Claims, and that such impaired class of Claims is not discriminated against unfairly;

(vi)    that the Plan is in the best interest of holders of Claims, *i.e.* each holder of an allowed claim either has accepted the Plan, or will receive on account of its claim, an amount of property with a value

- 69 -

that is not less than the amount that the holder of a claim would

receive if Debtor were liquidated under Chapter 7 of the Bankruptcy

Code; and

(vii)   that the Plan is feasible.

Dated this 20th day of May, 2014.

### DEBTOR HUDGINS HOLDINGS, INC.


By:      */s/ Morris B. Sprayberry, Jr.*___
         MORRIS B. SPRAYBERRY, JR.
         Managing Member

JIMMY L. PAUL
*Georgia Bar No. 567600*
Chamberlain, Hrdlicka, White, Williams & Aughtry
191 Peachtree Street, N.E., 34th Floor
Atlanta, Georgia  30303
(404) 659-1410
(404) 659-1852 (facsimile)
jimmy.paul@chamberlainlaw.com

*Counsel for Debtor Hudgins Holdings, Inc.*

1970101v1

- 70 -